1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEANDRE MAURICE HILL,

Petitioner,

v.

ANTHONY HEDGEPETH,

Respondent.

Case No.  12-cv-03873-JD

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the Court. Petitioner filed a traverse. For the reasons set forth below, the petition is denied.

## BACKGROUND

A jury found petitioner and his brother, Darryl Hill, guilty of first degree murder. Clerk's Transcript ("CT") at 853. Petitioner was sentenced to life in prison without parole, plus a consecutive ten-year term and consecutive one-year term. *Id.* The California Court of Appeal modified the one-year enhancement of petitioner's sentence, but otherwise affirmed the conviction. *People v. Hill*, Nos. A124123, A124244, 2011 WL 213573, at *27 (Cal. Ct. App. Jan. 25, 2011). The California Supreme Court denied his petitions for review. Resp. Exs. D1, D2, E2.

The California Court of Appeal summarized the facts of the crime as follows:

> In January 2008, Abel Martinez Mejia was shot and killed while waiting for his food at a lunch truck parked at 85th and San Leandro Streets in Oakland. Griselda Guzman was working as the cashier in the truck and her nephew, Lodegario Pelayo, was working as the cook. Guzman testified that when she asked Mejia for $5 for his burrito, a black man with his hair in "little braids" stepped between Mejia and the truck, with his back to the truck, grabbed Mejia,

pushed him and took out a black gun.  She did not hear the man say anything.  Two or three other black men who looked about 18 to 25 years old were standing by the front of the truck, one of whom also took out a short, black gun.  This man looked about 18 to 25 years old.  Guzman dropped to the floor of the truck, from where she heard three or four shots close by.  It was stipulated that if he testified, the officer who interviewed Guzman in Spanish would state that she told him the man blocking the window of the taco truck was wearing a green sweater.

Lodegario Pelayo Fregoso had noticed a red Mazda RX-7 on 85th Street that backed up and parked in front of the lunch truck.  A green car also came from 85th Street and parked.  Fregoso saw a 20 to 25-year-old black male with hair "down to the neck" in little braids, wearing a green sweater, get out of the red car.  He also saw a similar aged black male with short hair, wearing a white tee shirt, get out of the red car.  The second man was about five feet five inches or five feet six inches, and the man in the green sweater was taller.  Another two black men to the side of the green car did not approach the lunch truck.

The man in green came up to where Mejia was standing at the window of the truck, buying his food, and stood between Mejia and the truck with his back to the truck.  Fregoso heard the man say something like, "Give me everything you have.  Everything you have."  The man grabbed Mejia by the collar of his shirt and Mejia took three or four steps backward with his hands up.  Fregoso heard four or five shots and saw part of an arm with a firearm, but his view of the rest of the shooter's body was blocked and he could not tell who it was.  He bent down, then stood up about a minute later when he heard the man screaming.  He also heard car doors closing.  When he stood up a minute later, he saw the red car driving away fast, behind the green car.  Fregoso wrote down what he saw of the red car's license plate, 3KLM97.  He thought the man in the green sweater and the man in the white tee shirt left in the red car.  Fregoso testified that he saw only one gun during the incident.  Although he did not recall it independently at the time of trial, in a recorded statement on the evening of the shooting, Fregoso told the police that there was a man with a gun in each of the cars.

The parties stipulated that Fregoso told a police officer that two vehicles drove past the taco truck on 85th Avenue, then turned around and backed into the dirt lot by the taco truck with their front ends facing 85th Avenue.  Officer Gus Galindo interviewed Fregoso in Spanish on the night of the incident.  Fregoso said he did not see the man driving the Mazda RX-7, who was wearing a green sweater, with a gun.  A male passenger in the car, wearing a white tee shirt, had a gun and fired it.  One of the two men Fregoso saw associated with the other car also had a gun.  The man in the green sweater was the one who grabbed Mejia.  Fregoso described the green sweater as a polar fleece material with a collared top and no hood.

. . .

The cause of Mejia's death was multiple gunshot wounds . . . .
Five cartridge casings recovered from the scene were determined to

2

be from .22 long rifle caliber cartridges fired from a single .22 caliber semiautomatic firearm.  Unfired cartridges examined in relation to the case were of the same type and by the same manufacturer as the casings found at the scene, and the bullet fragments recovered from Mejia's body were the same caliber and style.

In January 2008, Salah Davis was living with Darryl and their four children on Hawley Street in Oakland.  Deandre, his girlfriend Nikole Meadows and her baby sometimes stayed in their living room.  Davis testified that Darryl was about six foot four or five inches and wore his hair in "dreads."  Deandre's hair was in shoulder length dreads.

On the day of the shooting, Davis, Darryl and their children stopped by Darryl's grandmother's house, then left together with Deandre, Meadows and her baby. Davis and her family were in their "greenish-blue" two-door car, with Darryl driving; the others were in Deandre's red Mazda RX-7, with Deandre driving.  They stopped at a taco truck and Darryl and Deandre got out of their cars and walked together to the truck, where Davis saw two Hispanic men standing.  She testified that Deandre grabbed money from the hand of one of the men, then a few seconds later Darryl shot the man. She saw a dark gun in Darryl's hand and saw "something dark" in Deandre's hand as well, but she did not see Deandre shoot.  Nor did she see Deandre grab the Hispanic man by the shirt.  Davis could see that Meadows, in the car next to hers, was also looking at the taco truck.  After the shots were fired, the brothers ran back to the cars.  When Darryl got into the car, Davis said, something like, "What the fuck?"  He told her to "shut the fuck up."  The group drove "very fast" back to the grandmother's house.  Davis and her family left after a few minutes and eventually returned home.  Davis testified that Darryl was wearing jeans and a blue hoody that said "Phat Farm" in white or red writing over a white tee shirt.  Deandre was wearing a fatigued hoody with a cream, black and grey print.

Davis testified that when she first spoke to the police about the shooting on February 14, 2008, she did not tell the truth: She said she heard shots but did not see anything.  She was afraid that Darryl would find out and hurt her if she told the truth.  In the past, Darryl had punched or hit her, resulting in black eyes, and she had torn a ligament in her leg during a struggle with him.  On one occasion, Darryl shot Davis in the back of the neck with a BB gun on a camping trip because he was unhappy about Davis having gone for a walk with Deandre; he also initiated a physical fight with Deandre. Darryl physically abused Davis several times a week, but Davis never called the police about Darryl because she was afraid.  Davis testified that Deandre had seen marks on her from the abuse.  On February 14, 2008, she and her children were staying at her aunt's house, "basically hiding from" Darryl, but Davis ended up going back to him because she loved him.  After talking to the police, Davis heard on the news that there was a reward in connection with this case.

On March 19, Davis, Darryl and their children were pulled over in Richmond; Darryl was arrested and Davis was taken to the police

3

department.  Davis testified that the police told her they thought her February 14 statement was a lie, and asked who would care for the children if she and Darryl both "went away."  This time she told the truth about the shooting.

Oakland Police Sergeant Tony Jones testified that he interviewed Davis on February 14, 2008, and she told him she saw a gun in Deandre's hand at the taco truck, but did not see him shoot it.  He interviewed her again on March 19.  He did not talk to Davis on either occasion about the possibility of her children being placed in foster care or Davis being charged in the murder case.  Davis talked at length about her concern for her children and how it would affect them if Darryl was arrested.

Russzarria (Nikole) Meadows testified that she had been dating Deandre for about two years; she was in love with him and they had talked about getting married.  Meadows had also known Darryl for a couple of years.  She viewed Darryl as a friend and a brother, and denied ever having been flirtatious or having had sexual relations with him.

On January 22, 2008, Meadows and Deandre drove to the taco truck at 85th and San Leandro with Darryl and his girlfriend in another car.  She did not remember the kind or color of either car.  The cars arrived seconds apart; she did not remember which parked first.  Deandre and Darryl got out of the cars and walked to the taco truck.  Meadows stayed in the car listening to music and did not see anything Deandre or Darryl did at the taco truck or hear shots.  She looked at the truck when she heard a commotion there and saw the man who got killed and three men running away in the same direction.  One of these men was wearing a black hoody and another was black.  Deandre and Darryl returned to the cars. Meadows asked what happened and Deandre said someone started shooting.

Meadows testified that on the evening of February 5, the police came to her home, took her to the police station in handcuffs, and left her alone in a locked room for about three hours.  She identified a photograph of Deandre, and they took a taped statement from her in which everything she said was what the police told her to tell them when she was being transported to the station.  She testified that Sergeant Jones told her if she did not say what he wanted her to say, he was going to put her daughter in foster care.  About a week later, her mother "made her" go back to the police and she gave another statement in which she said Darryl was the person in the other car and identified a picture of him.   She told the police "[w]hatever my mom told me to tell them"; some of what she said was a lie.

Sergeant Jones testified that Meadows was placed in the interview room at 12:20 a.m. on February 6, taken to get coffee at 1:10 a.m., and left in the room until the interview began at 2:00 a.m.  He and his partner talked with Meadows for two hours and 15 minutes, then took a taped statement.  Jones testified that there was no conversation about the incident in the car on the way to the police station and that he never told her what to say.  Meadows initially said that at the time of the shooting she was asleep in the car, woke

up when they were driving away from the taco truck with Deandre's friends following them in a blue car, and she did not know what happened at the taco truck.  Jones said he did not believe her. Meadows then said Deandre had been driving his red car and his friend the blue car, they passed the taco truck, someone made a U-turn, the drivers had a brief conversation and they drove to the lot by the truck.  She said they had been coming from a beauty supply store on 9th Street and Deandre had called friends and met them on 50th, near International.  There were two guys and a girl in the blue car whom Meadows had seen but did not know.  She saw Deandre go to the truck with a friend, saw a Latino "swinging on" Deandre and heard some shots, and saw Deandre pull out a gun.  Jones discussed with Meadows her being afraid of Deandre because he saw the police pick her up. In her taped statement, Meadows said that she only knew the person that accompanied her and Deandre to the taco truck as "bruh."

Sergeant Jones testified that in the second interview, on February 11, Meadows told him some friends had told her Darryl had been looking for her in East Oakland.  She acknowledged that Darryl was the person with Deandre and that they both pulled out guns, but the shots were fired by Darryl.

Meadows's mother, Alise Franklin, testified that the night before her second police interview, Meadows had told her she had seen the shooting of a Latino man at the taco truck while she was with appellants and Darryl's girlfriend.  Meadows told Franklin she saw appellants "in a commotion trying to rob the Latino man and ended up in the shooting" and saw both Deandre and Darryl shoot. Meadows did not want to go to the police on February 11, but Franklin persuaded her.

Meadows testified that in August the district attorney played her tapes of phone calls in which Deandre talked about other women. They did not make her feel jealous, but she could tell that the purpose of playing them for her was to make her mad at Deandre and "go against him."

Deandre was arrested on February 6, 2008, after a police officer observed him driving Davis's car and followed him to Hawley Street.  Deandre asked why he was being stopped and said he was "only going to his sister Salah Davis'[s] house."  He pointed out the residence and said he had been staying there and had the keys, had done nothing wrong, had previously been stopped in the same location in his red Mazda, and had gotten rid of the Mazda.  The police obtained a warrant to search the Hawley Street residence. They seized a plastic camouflage bag containing a plastic case holding five Remington 20-gauge shotgun shells, a gun cleaning solvent or lubricant and cleaning patches from a kitchen cabinet, a photograph of Deandre and a clear plastic sandwich bag containing .22 caliber long rifle rounds and a box of .25 caliber ammunition from a living room closet, and, from a footlocker in an upstairs room, a box of P.M.C. .357 magnum ammunition, a box of "Fiocchi .38 Smith and Wesson specials," a box of .357 magnum "Winchester super X" ammunition, a box of CCI Blazer .380 ammunition wrapped in a stocking cap, a box of .22 long rifle brass

plated hollow-point rounds, an empty case for a revolver or small handgun, a box of P.M.C. .25 caliber live rounds, and a clear plastic gallon sized zip-loc bag containing .20 gauge shotgun shells.  No firearms were found in the residence.  The police found no indicia that Deandre was associated with the residence.

Davis testified that earlier on the day of the search, she had removed from a closet a backpack that she thought was Darryl's and "had an idea" contained a gun, and took it to Darryl's cousin Jardon Jenning's house, because she did not want the gun in the house with her children and was worried the police might show up.  She gave the backpack to Jenning, saying something like, "It's in there."  She first told the police about this in August 2008, at which time she was promised that she would not be prosecuted for removing it from her home.  She had not said anything about it previously because she was afraid of being in trouble.  Davis testified that she had never purchased ammunition for Deandre and did not know there was ammunition in her house.  Jenning, who was arrested with Deandre on February 6, 2008, testified that he had seen Davis earlier that day at a friend's house in Castro Valley, but she did not give him a backpack.

Meadows and Deandre wrote many letters to each other after his arrest, and she had visited him four times in jail.  In one letter, Deandre wrote that he was going to tell his attorney that he was "'forced to do what I did and you should say the same to him.  [¶] "Bruh" ... pulled out a thang and gave me a scary look and told me to get out, so I did.  Tell him you was scared too.  It's true anyway.  But he can't tell you what to say exactly but he can give you hints.  That is why I'm kind of telling you.  But rip this paper up after you read and don't write back talking about this because they read incoming mail and let me know if this letter is open when you get it, okay?'"  In another letter, Deandre wrote that the man on the taco truck had not recognized him in court and "'[n]ow, we have to work on getting our statements threw out, both of ours, because that is going to be the only thing that is holding me in here after that.'"  He also wrote that if they tried to bring her back to court, "'you was just scared because you never been in nothing like this before and they both were big and intimidating and never said you had any rights.'"

. . .

Deandre, 19 years old at the time of trial, testified that on the morning of January 22, 2008, Darryl called him at Meadows's house and suggested meeting at a check cashing place on High Street and International.  There, Darryl told Meadows to cash a check Davis had written to Meadows; Meadows tried but was unable to do so.  Deandre followed as Darryl drove to his house and waited outside while Darryl went in for about five minutes.  Deandre again followed as Darryl drove to the intersection of 85th and San Leandro.  Deandre thought they were going to a gas station before heading to Jenning's house in Hayward.  Driving on 85th Street, they passed the taco truck and Darryl stuck his arm out the window, pointed at the truck, then made a U-turn; Deandre pulled up next to him, Darryl said, "to the truck," and they drove to the truck and parked.

United States District Court
Northern District of California

Darryl came to Deandre's car, opened his door and told him to get out; Deandre, who did not want food, told Darryl to "go get your shit so we can go." Darryl asked him again and when Deandre declined, lifted up his shirt to show a gun and told Deandre to "come on." Deandre "didn't really want to say no no more. I knew it was something serious." He thought Darryl might want him to come with him in case someone saw him, because Darryl "had been getting in a lot of shoot-outs around that time," or might "want[ ] to do a purse snatch or something or probably just wanted to get something to eat." Darryl had told Deandre about purse snatchings he had done, about recently having "got into it" with Davis's brother and shot at him, and about having shot at a person he thought had taken advantage of Deandre in a car trade. Deandre also thought there might be a problem with his RX-7, for which he had traded another car five or six days earlier. Darryl had found a bullet shell in the car, thought there had been a "shoot-out out of the car," and was concerned about Deandre driving it, and someone Deandre knew had called and said he should stop driving the car because the person Deandre had gotten the car from had shot someone from it. Deandre testified that he was fearful for his life when Darryl lifted his shirt. He had seen Darryl with guns "[a] lot of times" before, including semiautomatics and shotguns.

When Darryl showed Deandre his gun, Deandre grabbed his own BB gun, feeling safer having it because a potential drive-by shooter would stop if they saw him with a gun. He put the gun in his pocket and walked to the truck, where he stood leaning on the counter, looking at Meadows in his car. Hearing Darryl whisper, "Dre," Deandre looked and saw Darryl nodding toward Mejia, who was directly behind Deandre. Darryl gestured, trying to get Deandre to look at or take money that was in Mejia's hand. Deandre hesitated because did not want to take the money, but when he saw Darryl reaching for his gun and knew "he was about to shoot and take the money," Deandre thought he would be able to take the money and leave without anything happening. Deandre thought Darryl was going to shoot him: Darryl was scowling, the same look he had had when he shot the BB gun at Davis on the camping trip, and Deandre could tell he was "hella mad" at him. Deandre snatched the money from Mejia's hand and Mejia backed up and swung his arm. Thinking Mejia was trying to hit him, Deandre intended to pull out his gun to scare Mejia so Deandre could leave. He did not have time to do so because he heard shots and Mejia staggered backwards. The shots came from behind Mejia, and no one other than Darryl was standing behind him. Deandre ducked, thinking at first that it was him, not Mejia, who had been shot, then ran to his car and drove to a gas station. He saw Darryl behind him in the rearview mirror during part of the drive. At the gas station, Deandre went inside to pay and when he came out, found Darryl parked in front of his car. He asked Darryl why he did it and Darryl said, "'I was trippin'.'" Deandre threw Mejia's money, still in his hand, at Darryl, told him he "wasn't fucking with him no more" and "walked off on him." Deandre drove to Jardon's house, then to Meadows's. Deandre did not see anyone else with a gun around the taco truck and did not see anyone run from the scene at the same time he did or see anyone else hanging out by the cars. The next day, Deandre drove by the

7

Berkeley marina and threw the BB gun out.

. . .

Deandre did not want to testify against his brother and his family members, who were in the courtroom, did not want him to. He was testifying because he was not guilty and did not want to be convicted of something he did not do. Acknowledging that he cut his hair in May 2008, he denied this was to alter his appearance from the day of the shooting or to appear more presentable to the jury, but rather that he was getting into a lot of fights because of Darryl telling people that Deandre was "telling," and "I got a few of my twisties pulled out." Deandre told his relatives that the police did not read him his rights in order to make it seem like he had been "screwed over" rather than having voluntarily given a statement about Darryl. He told one of his grandmothers that Sergeant Jones had beaten him for 15 hours, told the other grandmother that the police had made him lie, and told other relatives that Jones had slapped him and knocked him out of his chair, none of which was true. He believed that Darryl and Meadows were having a sexual relationship at some point and was "disappointed at" Darryl, but "mad" at Meadows because she lied to him about it. He testified that at the time of trial, if he were alone in a room with Darryl, and Darryl had a gun but he did not, he would be in fear for his life.

Deandre testified that he never told the police Darryl showed him a gun while Deandre was seated in his car because "they never asked ." He testified that he told the police he felt Darryl was going to kill him if he did not rob Mejia, but did not use those words, when he said he robbed Mejia because, "if I didn't ..., I was going to have to deal with him." He did not know why he told the police that he did not know Darryl had a gun. He did not tell them his brother forced him to do it because they did not ask. He did not grab Mejia by the shirt or see anyone else do so.

He lied when he told the police he did not own any guns.

. . .

Sergeant Jones interviewed Deandre beginning at 11:30 p.m. on February 6, and began recording his statement at 1:33 a.m. on February 7. Deandre said he had been living with "his sister Salah" at her residence on Hawley Street, having been kicked out of his grandmother's home on Pacific in Alameda. About the shooting, he initially said that Darryl grabbed Mejia's money and shot him; he, Deandre, did nothing. After Jones told him what Meadows had said, Deandre said he took the money from Mejia, Mejia "swung on him," and Darryl shot Mejia. Asked what he thought was going to happen when Darryl told him to get out of the car, Deandre said, "'I knew it was about to be some type of something, but I didn't think it was going to be nothing like that,'" and "'[i]ntentions wasn't even to go get the money. I was going to go watch actually.'" At the gas station after the shooting, Deandre said, he asked Darryl "what the fuck did you-and I couldn't even look at him. Had to just leave.'" Jones asked what was going through Deandre's mind when he took Mejia's money and Deandre said, "'I don't know. It was like-if I

wouldn't have did that, I don't know what would have happened, cause it was like when we walked up he was waiting on me to make a move or something.'" In response to a follow up question, Deandre said, "'God forgive me.'" Deandre never said that he initially declined to get out of the car and Darryl asked him again, and never said Darryl showed him a gun while Deandre was still seated in his car, that he saw Darryl grab for his own gun before Deandre grabbed Mejia's money, that he feared Darryl would kill, shoot or injure him if he refused to commit a robbery, or that he felt his life threatened by Darryl.

. . .

[Darryl testified that] [o]n January 22, 2008, Deandre, Meadows and her daughter arrived at Darryl's apartment building without warning, just as Darryl and his family were leaving. Darryl stopped to talk to Deandre, who said he needed money for gas, and Darryl gave him ten dollars. They all headed for a gas station, but on the way arrived at the taco truck, where Darryl had been a few times before. Deandre parked, then Darryl parked; Deandre got out first, then Darryl got out and saw Meadows and Davis getting out. Darryl walked toward the truck, intending to get food for the four adults. Before Darryl could get all the way to the truck, he saw Deandre approaching a man standing at the window where people get food from the truck. Deandre "snatched something" from the man, pulled out a pistol "real quick" and shot him. Darryl thought he heard Deandre say something like "[g]ive me your money" or "[g]ive me what you got." The man jumped back and put his hands up in front of him; he did not swing at Deandre. The man was "turning slowly" when he was shot. Asked if he could explain how the man got shot in the back of the head, Darryl said, "[m]aybe as he was turning, I guess," and denied that it was because he was standing behind the man to the left. Darryl said he was standing by the front bumper of the truck and never got close to Deandre or the man, and did not have any weapons with him. After the man was shot, Darryl ran back to his car, not wanting to be involved. Deandre beat him back to the cars and pulled out first, and Darryl followed him to the gas station.

*Hill*, 2011 WL 213573, at *1-12 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*,

United States District Court
Northern District of California

529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003);

*Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

### DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) his right to due process was violated by the consolidation of his case with his brother's case; (2) the trial court's denial of a continuance resulted in his unprepared defense counsel going to trial, which violated his right to due process and the Sixth Amendment; (3) the trial court's denial of a defense request for a limiting instruction to the jury violated due process; (4) the prosecutor engaged in misconduct; and (5) trial and appellate counsel provided ineffective assistance.

## I.    CONSOLIDATION OF CASES

Petitioner argues that the consolidation of cases, and the later denial of the motion to sever, violated his due process rights because the parties presented antagonistic defenses.

### A.    Legal Standard

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.  *Id.*, at 370.  Nor is it concerned with procedural right to severance afforded in federal trials.  *Id.*; *see Collins v. Runnels*, 603 F.3d 1127, 1131-32 (9th Cir. 2010) (finding that Supreme Court decisions addressing severance under federal rules do not apply to analysis of whether joinder in state courts was constitutional).  Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.  *Grisby*, 130 F.3d at 370.  To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair.  *Id.*  In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

"[T]here is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses." *Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012) (rejecting ineffective assistance of counsel claim premised on counsel's failure to join co-defendant's motion to sever); *see also Collins*, 603 F.3d at 1132-33 (holding that *Zafiro v. United States*, 506 U.S. 534 (1993) and *United States v. Lane*, 474 U.S. 438 (1986), which analyzed severance under the Federal Rules of Criminal Procedure, did not clearly establish a constitutional standard upon which habeas relief may be granted under AEDPA).

## B.      Analysis

The California Court of Appeal denied this claim:

> As the prosecutor expressly acknowledged below, appellants' defenses were unquestionably antagonistic: Deandre claimed that he participated in the robbery only because he was afraid of Darryl, and that Darryl shot Mejia; Darryl claimed that Deandre acted alone, robbing and shooting Mejia while Darryl was still on his way to get food at the taco truck . . . .
>
> Here, there was abundant evidence against both Deandre and Darryl aside from the conflict in their defenses. Guzman and Fregoso, the taco truck workers, both described the incident being perpetrated by two men with guns. Davis saw Deandre grab money from Mejia and saw Darryl shoot him. While Meadows disclaimed any knowledge about the incident in her trial testimony, she had told the police that she saw both brothers pull out guns and that Darryl shot Mejia, and she had told her mother that she saw both appellants involved in the shooting. In his statements to the police and to family members about the incident, Deandre never mentioned being threatened by or afraid of Darryl.
>
> . . .
>
> "Joint trials are favored because they 'promote [economy and] efficiency' and "'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" [Citation.]" (*People v. Coffman and Marlow*, supra, 34 Cal.4th at p. 40, quoting *Zafiro v. United States, supra*, 506 U.S. at p. 537.) Here, appellants were charged with the same offense arising out of a single incident; the forensic evidence against them was the same, as were the witnesses. This was a "'classic case' for a joint trial" (*People v. Hardy*, supra, 2 Cal.4th at p. 168) despite appellants' conflicting defenses. The trial court did not abuse its discretion in consolidating the cases or refusing to sever them, and appellants have not shown that trying them jointly "resulted in 'gross unfairness' amounting to a denial of due process." (*People v. Lewis, supra*, 43 Cal.4th at p. 452, quoting *People v. Mendoza*, supra, 24 Cal.4th at p. 162.)

*Hill*, 2011 WL 213573, at *14-15.

Petitioner has not demonstrated that he is entitled to habeas relief. As noted above, there exists no "clearly established Federal law, as determined by the Supreme Court of United States" mandating the severance of joined charges, even with antagonistic defenses. *See, e.g., Grajeda v. Scribner*, 541 Fed. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution.") (citations omitted).

Nor has petitioner shown that the joinder of counts and refusal to sever were so prejudicial that they rendered his trial fundamentally unfair. He argues that he was prejudiced by the antagonistic defenses, but he presents no specific allegations of how he was prejudiced. A review of the record does not indicate any prejudice, and, as noted by the California Court of Appeal, there was abundant evidence incriminating petitioner, despite the conflict of the defenses. This claim is denied.

## II.    DENIAL OF CONTINUANCE

Petitioner next argues that his rights were violated when trial counsel's requests to postpone trial were only partially granted, despite statements that trial counsel was not prepared.

### A.    Legal Standard

To establish a constitutional violation based on the denial of a continuance motion, a petitioner must show that the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (citation and internal quotation marks omitted) (finding trial judge acted within his broad discretion in denying motion for continuance to retain private counsel). In addition, the improper denial of a requested continuance warrants habeas relief only if there is a showing of actual prejudice to petitioner's defense resulting from the trial court's refusal to grant a continuance. *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

A requisite abuse of discretion will be found if, after carefully evaluating all relevant factors, it is concluded that the denial is arbitrary or unreasonable. *See Armant v. Marquez*, 772

United States District Court
Northern District of California

F.2d 552, 556 (9th Cir. 1985).  When considering whether there has been an abuse of discretion, the Court looks to four factors: (1) the degree of diligence by the defendant prior to the date beyond which a continuance was sought; (2) whether the continuance would have served a useful purpose if granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; and (4) the amount of prejudice suffered by the defendant as a result of the court's denial.  *See id.*; *see, e.g., United States v. Thompson*, 587 F.3d 1165, 1173-75 (9th Cir. 2009) (finding district court did not abuse its discretion in denying defendant's request for reappointment of counsel/continuance at final pretrial conference, held three and a half years after the initial pretrial conference; request was made for purposes of delay and to disrupt proceedings).

**B.    Analysis**

The California Court of Appeal set forth the relevant background and denied this claim:

> On June 6, 2008, Deandre's attorney requested funds for investigation into Deandre's duress defense, which would include psychological testing, interviewing family members, and obtaining school and health records.  The court expressed some question whether duress was available as a defense to murder, but authorized funds for the investigation.  At this point, the trial was set for July 28, with Darryl having waived time and Deandre not waiving time; the prosecution had filed its motion to consolidate three days before.  On July 18, Deandre moved to continue the trial on the basis of difficulties encountered in preparing for trial, including scheduling a hearing on a *Pitchess* motion, obtaining records from the juvenile court, and reviewing recently received discovery, as well as other matters to be discussed with the court in camera.  On July 28, with counsel representing that he was "80 to 85 percent certain" he could be ready for trial in November, the court granted a one-week continuance to August 4.  Deandre waived time for trial.

> Deandre filed another motion to continue the trial on July 31. Counsel explained that he had represented Deandre from February 11 until May 1, 2008, when his motion to be appointed was denied, then began to represent him again on June 6, 2008, after obtaining writ relief from this court.  The interruption in his representation delayed counsel's filing of a discovery motion, disrupted the continuity of his thinking about the case, and required him to work around commitments made during the period of interruption. Counsel's declaration detailed his unsuccessful efforts to have the prosecutor stipulate to a continuance when he realized he would not be ready for trial, and described the factors that were delaying his preparation despite his diligent efforts, including pursuing a witness he learned about after a discovery motion was granted, difficulty

14

obtaining Darryl's juvenile court records, the court's failure to authorize funds for a mental health expert for some 43 days, which prevented counsel from determining the defense he would pursue, the prosecution's ongoing investigation and failure to produce certain test results, and the need for further witness interviews. The prosecution opposed the motion. After an in camera discussion with Deandre's attorney, the court found good cause for a continuance on one ground related to a mistake by the court but, as to the others, found counsel had not been diligent and there was "some level of game-playing going on related to the timing of trial." Trial was set for September 9, 2008.

Deandre filed another motion to continue on September 5, 2008. Counsel stated he was not fully prepared for trial because the whereabouts of exculpatory witnesses were unknown, but were being actively sought; the police department had not complied with a subpoena, and a hearing was likely to be needed regarding subpoenas for Darryl's medical and psychiatric records; time would be needed for investigation once the subpoenaed records were produced; and more time was needed to review recorded jail calls produced in discovery. Counsel did not anticipate being ready for trial for two or three weeks. The motion was denied, the court explaining that discovery and investigation would continue throughout the trial. The court commented that Deandre's attorney had been working diligently and was "basically ready for trial," although "[t]here are things that need to be done as there are with any trial."

On the first day of trial, September 9, 2008, Deandre's attorney informed the court that he was not prepared, investigation was continuing, and there were witnesses he was still trying to find but could not yet state his intention to call. The court noted that jury selection was not scheduled to begin until September 22. On September 17, at the conclusion of a hearing on a defense motion to suppress evidence, counsel reiterated that he was not ready for trial despite having been "working more hours than I care to talk about" and, in particular, would not have time for the 40 recorded jail calls he had not yet reviewed (of 140 total) in addition to the rest of his preparation. The trial court stated that counsel still had a lot of time as evidence presentation would not being until September 29.

At the end of the day on October 15, counsel told the court he needed to make a phone call to see whether he was going to be prepared to proceed with a witness the following day. The court responded that it was not going to grant a continuance for any reason.

Deandre subsequently moved for a new trial on the basis that he was forced to proceed to trial with counsel who had notified the court he was not prepared and that new evidence had been discovered that could not, with reasonable diligence, have been produced at trial. Counsel's declaration described the ways in which he was not prepared, including insufficient investigation into the incident at appellants' uncle's home and inability to obtain statements from family members concerning Darryl's mental health problems. Counsel had obtained the uncle's medical records, which would corroborate his testimony that he was a schizophrenic and used

crack cocaine, and statements about Darryl's mental instability and violence from several family members who had previously refused to discuss these matters with Deandre's defense or whom the defense had not had time to interview. The court viewed the evidence as collateral, in that the "significant" testimony was from the witnesses to the incident, and denied the new trial motion.

The issue of counsel's insufficient preparation was raised again at sentencing, when counsel told the court the proceeding against Deandre was "fundamentally flawed" throughout and Deandre had not been given the chance to present a full defense.

. . .

Deandre argues that his attorney did not have the opportunity to interview many family witnesses prior to trial who could have provided important evidence supporting his defense and that he was not given sufficient time to investigate all aspects of the incident at his uncle's house so as to lessen the impact of that incident. Deandre does not explain how additional time would have allowed him to present more favorable evidence regarding the shooting at his uncle's house: He points to his uncle's medical records, but explains neither why these records could not have been obtained sooner nor how the information they contained would add significantly to Antoine's own admission that he was schizophrenic and used cocaine. Deandre also does not explain how a continuance would have enabled him to obtain the statements he ultimately obtained after the trial from four family members concerning Darryl's mental health and character. According to the declarations submitted in support of the new trial motion, two of these witnesses refused to speak to the defense investigator before trial because they did not want to "take sides." Deandre offers no suggestion why a pretrial continuance would have altered this refusal; indeed, in discussing the new trial motion with the trial court, counsel acknowledged that his level of preparation for trial was irrelevant as to the witnesses who "weren't willing to take sides between the brothers until after trial." Another of the family members was not interviewed before trial because counsel placed him low on his priority list. Counsel acknowledged that he had the information contained in the declaration of the fourth witness before trial and does not explain what corroboration he believed he needed in order to present it effectively or why he could not obtain it.

Deandre's attorney represented him from February until May 1, 2008, then again from June 6, 2008 on. Although he was never granted the lengthy continuances he sought, he did receive a one-week continuance of the original trial date and then a one-month continuance. The trial court considered the requests carefully, in particular the July 31 request, as to which the court met privately with Deandre and his attorney and explained that it had reviewed counsel's bills and found he had spent very little time on the case in June and July, indicating either that he was ready for trial or had not exercised due diligence, and that he had spent no time on several of the tasks for which he was now saying he needed time. The court also noted several areas in which counsel had not been diligent and commented on the discrepancy between counsel's earlier assertions of readiness to go to trial in June on a no time waiver basis, and his

16

current assertions that he was not ready for trial. At that point in time, the court found a one-month continuance justified due to a court error, but denied a longer continuance because it found counsel had not been diligent and it was concerned about "game-playing" related with the timing of trial. Subsequently, the court found that the remaining investigation counsel sought to pursue could be conducted on an ongoing basis during trial. We find no abuse of discretion in the refusal to grant further continuances and no deprivation of Deandre's Sixth Amendment rights.

*Hill*, 2011 WL 213573, at \*16-18 (footnotes omitted).

Petitioner has not shown that the California Court of Appeal unreasonably applied Supreme Court authority in finding that the trial court's denial of the continuance was neither arbitrary nor unreasonable. The trial court carefully considered the many requests for a continuance and granted two of them. On July 28, the day trial was set to commence, trial counsel requested a continuance and the trial court granted a week postponement. A few days prior to trial starting on August 4, trial counsel again requested a continuance and after an in camera discussion with trial counsel, the trial court continued the trial more than a month to September 9. Trial counsel's third request on September 5 was denied by the trial court. The trial court noted that due to pretrial matters, jury selection would not begin until September 22 and evidence would not be presented until September 29; thus, trial counsel had additional time to prepare. Opening arguments commenced on September 29. CT at 513.

Petitioner is not entitled to relief as he has not shown any prejudice from the denial of the continuance nor has he demonstrated an abuse of discretion based on the factors set forth in *Armant v. Marquez*, 772 F.2d 552 (9th Cir. 1985). The California Court of Appeal discussed the additional witnesses and information that trial counsel sought and found none of the potential evidence vital to petitioner's defense. This conclusion was not unreasonable. Nor is there any support for the assertion that trial counsel was unprepared during trial causing a violation of petitioner's rights. In light of the overwhelming evidence presented against petitioner and because he has not shown either prejudice or that the trial court was arbitrary or unreasonable in denying the third motion for a continuance, this claim is denied.

## III.     JURY INSTRUCTION

Petitioner next alleges that the trial court erred by denying his request for a limiting

instruction to the jury regarding a prior shooting incident where he allegedly shot someone at his uncle's home.

### A.   Legal Standard

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id*. Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence).

Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

### B.   Analysis

The California Court of Appeal set forth the relevant background and denied this claim:

> Deandre contends the trial court erred in refusing his request for a limiting instruction telling the jury to use the evidence of the shooting incident at his uncle's house only to rebut his duress defense and impeach him on this issue, and not as evidence of his character or propensity. In discussions about the admissibility of testimony about this incident, the prosecutor stated that she did not plan to use it as Evidence Code section 1101 evidence, for which it would have to be similar to the charged offense, but to challenge Deandre's testimony that he was scared of Darryl, whom he portrayed as dangerous, armed and hotheaded, by showing that a year before it was Deandre who was hotheaded and violent. The court found the evidence admissible.

> Before the evidence was presented, Deandre requested a limiting instruction telling the jury it was not to be considered as character or propensity evidence, but only for the purpose the prosecutor stated. The court declined, stating it did not want to "suggest to [the jury] how to look at this evidence," Deandre had put at issue the question

whether he acted under duress in the present offense, and the uncharged offense was relevant to rebut Deandre's portrayal of himself.

Later, counsel again requested CALCRIM No. 375, the limiting instruction regarding permissible uses of evidence of uncharged offenses.   The court denied the request, again stating that the evidence had come in solely to impeach Deandre.

CALCRIM No. 375 directs the jury that the prosecution presented evidence that the defendant committed a specified uncharged offense and, if it finds by a preponderance of the evidence that the defendant committed the uncharged offense, it may consider the evidence for a specified limited purpose, but not to conclude the defendant has a bad character or is disposed to commit crime.  Here, Deandre wanted the jury to be told it could consider the evidence of the incident at Uncle Edgar's house only for the limited purpose of determining whether Deandre acted under duress in the present case. Evidence Code section 1101 provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion"  (Evid.Code, § 1101, subd. (a)), but such evidence is admissible to show "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act" (Evid.Code, § 1101, subd. (b)).  Evidence Code section 1101 does not affect "the admissibility of evidence offered to support or attack the credibility of a witness."  (Evid.Code, § 1101, subd. (c.).)

Deandre contends that the evidence that he shot Davenport "arguably fit within at least one category of evidence covered by section 1101, subdivision (b)" and, therefore, "a limiting instruction was required upon request."  The absence of an instruction directing the jury as to the permissible use of this evidence, he maintains, permitted the jury to convict him of the charged murder because it found he was a bad man with a propensity to use guns.

When evidence of uncharged offenses is admitted under Evidence Code section 1101, the trial court must give a limiting instruction upon request.  (*People v. Grant* (2003) 113 Cal.App.4th 579, 591; Evid.Code, § 355.)  Here, as the trial court explained in denying the requested instruction, evidence of the incident at Edgar's house was not offered under Evidence Code section 1101, but in order to impeach Deandre's credibility, in response to his testimony that he had not previously shot guns and was not a violent person.  *People v. Sapp* (2003) 31 Cal.4th 240, 281, held that "[n]o instruction on propensity evidence was . . . warranted" where evidence concerning other murders was cross-admissible to rebut a defense that the defendant's confessions should not be believed because he tended to falsely confess crimes he did not commit.  Appellant correctly points out that *Sapp* was concerned with a claim that the court should have

given a limiting instruction on its own initiative, rather than in response to a request.  (*Ibid.*)  Trial courts generally are not required to give limiting instructions sua sponte.  (*People v. Grant*, at p. 591.)  The language employed in *Sapp*, however, was that the instruction was not "warranted," not that the instruction was not required to be given sua sponte.

In any event, even if the trial court erred in failing to give the requested limiting instruction, the error was not prejudicial.  The evidence against Deandre was strong.  He was observed at the taco truck with Darryl, taking Mejia's money and holding a gun; other incriminating evidence included his letters from jail, which appeared to suggest how Meadows should testify; his sale of his Mazda RX-7 for parts shortly after he was contacted by the police; and his failure to tell the police that he acted as he did at the taco truck because he was threatened by or afraid of Darryl.  His familiarity with guns was evident from his acknowledgment that he kept a gun in his van, which he had relatives remove after his arrest.

Deandre urges that the evidence of the shooting at his uncle's house was exacerbated by the prosecutor's "propensity argument," telling the jury, "[y]ou are the violent one, Deandre."  In fact, the prosecutor never asked the jury to use the shooting incident as propensity evidence.  Initially, the prosecutor referred to the incident as part of her explanation why Deandre's duress defense did not make sense.  The prosecutor argued that all Deandre had given the jury to show he truly and reasonably believed Darryl was going to kill him if he did not take Mejia's money was Darryl's domestic abuse of Davis, his access to guns, the look he gave Deandre, and his going for his gun right before Deandre took the money.  The prosecutor then stated: "To say that you thought your brother was going to kill you if you didn't take the money under [those] circumstances is ridiculous especially because one year before that you shot a man in Uncle Edgar's house with your brother.  You did it. You are the violent one, Deandre, not Darryl.  That is why this doesn't make any sense.  That is why the duress defense doesn't make any defense [ sic ]."

Subsequently, the prosecutor clarified: "Deandre Hill stood up here and testified and really tried to make it look like he has basically never done anything wrong in his life.  That he stepped in for [Davis] when she was being beaten by Darryl.  That he has not shot Mr. Davenport. [¶]  Now, that incident with Mr. Davenport at Uncle Edgar's house is not being given to you for the purpose of proving that Deandre shot or took place in the murder of-at the taco truck.  That is not it's point.  The point of that incident is not to prove to you Deandre Hill is a bad man or Deandre Hill is a violent man.  You didn't hear about it until he took the stand and said that he was placed under duress by his brother.  That incident is a direct rebuttal to that. [¶]  You and your brother committed a crime before and you were the ring leader.  You were the leader.  You weren't acting at your brother's force of threats or violence. It was you acting on your own accord.  That's the point of the Uncle Edgar incident."  The prosecutor's remarks thus conveyed the substance of the limiting instruction Deandre requested, albeit without the force of an actual instruction from the court.

> In light of the evidence against Deandre, and the prosecutor's express explanation of the purpose of the evidence, there is no reasonable probability the outcome of the trial would have been more favorable for Deandre if the trial court had given the limiting instruction. (*People v. Stewart* (2004) 33 Cal.4th 425, 494; *People v. Wilson* (2008) 43 Cal.4th 1, 19.)

*Hill*, 2011 WL 213573, at *19-21 (footnotes omitted).

To the extent that petitioner argues that the state court incorrectly applied state law, he is not entitled to relief.   A challenge regarding jury instructions solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Nor has petitioner shown that the failure to give the limiting instruction so infected the trial that he was deprived of the fair trial guaranteed by the Fourteenth Amendment.  The trial court's decision was supported by state law, and the prosecutor was clear that the evidence was only to be used to rebut petitioner's defense of duress.  As there was no error egregious enough to deprive petitioner of a fair trial, this claim is denied.

## IV.    PROSECUTORIAL MISCONDUCT

Petitioner contends that the prosecutor committed misconduct by knowingly presenting perjured testimony by witness Nikole Meadows, petitioner's girlfriend.

### A.   Legal Standard

When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

To prevail on a claim based on *Agurs/Napue*, the petitioner "'must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material. '"  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)); *see Schad v. Ryan*, 671 F.3d 708, 717 (9th Cir. 2011) (per curiam) (finding no

United States District Court
Northern District of California

prosecutorial misconduct where it was not entirely clear that prosecution witness had lied or, assuming he did, that the state knew or should have known that his testimony was false). "Material" means that there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury. *Morris v. Ylst*, 447 F.3d 735, 743 (9th Cir. 2006); *see Jones v. Ryan*, 691 F.3d 1093, 1106 (9th Cir. 2012) (false impression allegedly created by sketches not material because there was overwhelming evidence of guilt unrelated to sketches).

**B.   Analysis**

Petitioner contends that the prosecutor knowingly argued falsely to the jury that Nikole Meadows voluntarily went to the police and provided a statement against him.  Petitioner argues that Meadows' statement was inadmissible because it was obtained in violation of her Fifth and Fourteenth Amendment rights because she was taken to the police station against her will.  It appears that petitioner asserts that Meadows was under arrest when she provided a statement, not being interviewed, and thus he believes that the statement was improperly used against him.

Respondent first argues that this claim is procedurally defaulted because trial counsel never objected or requested an admonishment.  Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal.  *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983).  A petitioner who fails to observe a state's "contemporaneous objection" rules may not challenge the constitutionality of the conviction in federal court.  *See Engle v. Isaac*, 456 U.S. 107, 129 (1982).  Petitioner has not addressed the procedural default or attempted to show cause and prejudice that would allow the Court to consider the claim.  Regardless, the Court will look to the merits.  As this claim was denied without a reasoned opinion from the state court, the Court has conducted an independent review of the record.  *Delgado*, 223 F.3d at 982.[1]

---

[1] This claim was not in petitioner's direct appeal and while respondent has included a copy of the summary denial of petitioner's state habeas petition to the California Supreme Court (Resp. Exh. E2), the Court does not have a copy of the petition to the California Supreme Court.  The Court will assume the claim was presented and is properly exhausted.  Regardless, the Court can deny an unexhausted claim.  *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

United States District Court
Northern District of California

Petitioner includes a declaration signed by Meadows in 2012, several years after trial. Amended Petition at 40-42. In the declaration, Meadows states that when she was interviewed by Sergeant Jones of the Oakland Police Department she was not informed of her rights. *Id*. at 40. She states that she believed she had to go to the police station with the police. *Id*. Meadows does not allege that her statement to the police or her testimony at trial was false.

At trial, evidence was elicited that Meadows first provided a statement to the police on February 5, when she was taken to the police station in handcuffs. Reporter's Transcript ("RT") at 835-36. Approximately a week later, her mother convinced her to provide another statement to the police, and Meadows voluntarily returned to the police station with her mother. RT at 794-95. Meadows provided a recorded statement on both occasions.

While petitioner argues that the prosecutor committed misconduct by stating that Meadows voluntarily gave a statement to police, Meadows testified that she returned to the police station on the second occasion and provided a statement at the insistence of her mother. It seems petitioner is confused regarding the circumstances of the first and second statement, but there was no misconduct because evidence was presented to the jury that accurately reflected the circumstance of each statement and Meadows does not state in her declaration that any of her trial testimony or statements to the police were false. To the extent that petitioner seeks to assert a claim on behalf of Meadows, such a claim fails because petitioner does not have standing. There is no indication of misconduct, and the circumstances of each statement were presented to the jury. This claim is denied.

## V.      INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, petitioner argues that trial counsel was ineffective for failing to raise the prosecutorial misconduct claim regarding Meadows' statements, failing to challenge the procedures used by police in obtaining the statements from Meadows, and failing to file a motion to set aside the indictment. He also argues that appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct and a claim of ineffective assistance of trial counsel.

### A.      Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

23

1  Amendment right to counsel, which guarantees not only assistance, but effective assistance of

2  counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any

3  claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

4  of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id*.

5      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must

6  establish two things. First, he must establish that counsel's performance was deficient, i.e., that it

7  fell below an "objective standard of reasonableness" under prevailing professional norms.

8  *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's

9  deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

10  unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A

11  reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

12      The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

13  effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391-

14  405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the

15  standard set out in *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v.*

16  *Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010*); Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

17  The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so

18  undermined the proper functioning of the adversarial process that the trial cannot be relied upon as

19  having produced a just result. *Strickland,* at 686.

20      **B.    Analysis**

21      As this claim was denied without a reasoned opinion from the state court, the Court has

22  conducted an independent review of the record, *Delgado*, 223 F.3d at 982, yet petitioner has only

23  presented conclusory allegations and has failed to show that trial or appellate counsel was

24  deficient or that he was prejudiced. With respect to the claims involving Meadows' statements to

25  police, as described in the claim above, the underlying allegations are meritless; thus, counsel was

26  not ineffective for failing to raise or pursue the claim.

27      Petitioner also presents conclusory arguments that trial counsel failed to adequately

28  investigate the case or file a motion to set aside the indictment. Petitioner provides no support or

United States District Court
Northern District of California

24

specific allegations for these claims to describe how counsel was deficient or how he was prejudiced. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  In order to establish prejudice from failure to file a motion, petitioner must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).  These allegations are meritless because petitioner has only presented conclusory allegations and has not demonstrated that the motion would have been granted to result in a different outcome of the case.  Petitioner fails to assert any argument why the indictment should have been set aside.

Petitioner's allegations that appellate counsel was ineffective are also denied.  Appellate counsel was not deficient for failing to raise the prosecutorial misconduct claim, and petitioner has not shown that trial counsel was ineffective, which would have warranted appellate counsel raising an ineffective assistance of trial counsel claim.  Petitioner's conclusory allegations that an ineffective assistance of counsel claim should have been raised on appeal are insufficient.  Petitioner has not shown trial or appellate counsel was deficient or that he was prejudiced, therefore this claim is denied.

## VI.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id*. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has made no showing warranting a certificate and so none is granted.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  A Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: November 17, 2015

_____
JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEANDRE MAURICE HILL,

                    Plaintiff,

        v.

ANTHONY HEDGEPETH,

                    Defendant.

Case No.   12-cv-03873-JD

**CERTIFICATE OF SERVICE**

        I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.

District Court, Northern District of California.

        That on November 17, 2015, I SERVED a true and correct copy(ies) of the attached, by

placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by

depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery

receptacle located in the Clerk's office.

Deandre Maurice Hill ID: G-53079
CSP Solano State Prison A-6-117
2100 Peabody Road
P.O. Box 4000
Vacaville, CA 95696

Dated: November 17, 2015

                                Susan Y. Soong
                                Clerk, United States District Court

                        By:
                                LISA R. CLARK, Deputy Clerk to the
                                Honorable JAMES DONATO